**AMERICAN EMPLOYERS' INSURANCE COMPANY,**
Plaintiff,

v.

**SWISS REINSURANCE AMERICA CORPORATION, formerly known as North American Reinsurance Corporation, Defendant.**

No. CIV.A.00–12266–JLT.

United States District Court,
D. Massachusetts.

Aug. 5, 2003.

Richard Appel, Cadwalader, Wickersham & Taft, New York City, Adam G.

Cohen, Cetrulo & Capone, LLP, Boston, MA, Mark S. Fragner, Rubin & Fiorella LLP, New York City, Bruce M. Friedman, Rubin & Fiorella LLP, New York City, Philip J. Loree, Jr., Cadwalader, Wickersham & Taft, New York City, Clifford H. Schoenberg, Cadwalader, New York City, CharCretia V. DiBartolo, Cetrulo & Capone LLP, Boston, MA, for American Employers Insurance Co., Plaintiff.

David A. Attisani, Choate, Eric B. Hermanson, Choate, John A. Nadas, Choate, Boston, MA, for Swiss Reinsurance America Corporation, Defendant.

## MEMORANDUM

TAURO, District Judge.

Plaintiff American Employers' Insurance Company ("AEIC") brought suit against its reinsurer, Swiss Reinsurance America Corporation ("Swiss Re"), seeking a declaration that Swiss Re was obligated to indemnify it for certain claims it paid out. Before this court are AEIC and Swiss Re's cross-motions for Partial Summary Judgment. Swiss Re contends that, as a matter of law, it is not liable for $4,669,443 billed to it. AEIC, on the other hand, seeks a declaration that, as a matter of law, AEIC's request for indemnification was reasonable and consistent with the terms of the reinsurance contracts.

## BACKGROUND

From January 1, 1964 to January 1, 1971, Plaintiff AEIC issued three multiyear umbrella insurance policies to Pennsalt Chemicals Corporation ("Pennsalt"), the predecessor of Elf Atochem North America, Inc. ("Elf").[1] Policy A15–8075–001 ("A15–001") was effective from January 1, 1964 to January 1, 1967, policy A15–8075–002 ("A15–002") was effective from January 1, 1967 to August 1, 1968, and policy A15–8075–003 ("A15–003") was effective from August 1, 1968 to January 1, 1971. Both A15–001 and A15–002 had stated limits of $2 million each occurrence, excess of primary limits[2]. A15–003, however, had a stated limit of $5 million each occurrence, excess of primary limits.

AEIC, in turn, obtained reinsurance on the policies it had written for Pennsalt.[3] North American Reinsurance Company, Defendant Swiss Re's predecessor in interest, issued three facultative reinsurance certificates ("Certificates") to AEIC.[4] These facultative Certificates, each of which corresponds to one of the policies AEIC issued to Pennsalt, are quota share

---

1. *See* Exhibits 1–17 Accompanying Pl.'s Partial Mot. for Summ. J., Aff. of Richard M. Appel in Supp. of American Employers' Insurance Company's Mot. for Partial Summ. J. ("Appel Aff. I") Ex. 10–12.

2. This "excess of primary limits" language is like a deductible, in the sense that AEIC is not liable until the primary limit, in this case $25,000, has been reached.

3. Reinsurance is insurance for insurance companies, and "occurs when one insurer (the 'ceding insurer' or 'reinsured') 'cedes' all or part of the risk it underwrites ...." *Unigard Sec. Ins. Co. v. N. River Ins. Co.,* 4 F.3d 1049, 1053 (2nd Cir.1993) (internal citations omitted). Reinsurance spreads the risk of loss to multiple insurers and reduces the required capital reserves. *See id.* Because

reinsurers have no direct liability to the original insured, reinsurance contracts are contracts of indemnity, not liability. *See id.* "Reinsurers do not examine risks, receive notice of loss from the original insured, or investigate claims." *Id.* (internal citations omitted).

4. The two basic types of reinsurance policies are "facultative" and "treaty." Facultative reinsurance policies reinsure all or part of a single insurance policy. Treaty reinsurance policies, on the other hand, cover a specified class of policies (for example, property damage policies or earthquake insurance) underwritten by the ceding insurer or insurers. *See, e.g., id.; Commercial Union Ins. Co. v. Seven Provinces Ins. Co.,* 9 F.Supp.2d 49, 51–52 nn. 1–2 (D.Mass.1998).

reinsurance certificates, which means that Swiss Re agrees to indemnify AEIC for a certain percentage of loss. Certificate 100216 corresponds to A15–001, and establishes a reinsurance coverage limit of 50% of $2 million each occurrence, in excess of underlying limits of primary insurance.[5] Certificate 101665 corresponds to A15–002, and also establishes a reinsurance coverage limit of 50% of $2 million each occurrence, in excess of underlying limits of primary insurance.[6] Lastly, Certificate 102852 corresponds to A15–003 and establishes a coverage limit of 40% of $5 million, in excess of underlying limits of primary insurance.[7] In addition to establishing the limits of Swiss Re's liability, Certificates 101665 and 102852 each provide that Swiss Re's "liability ... shall follow that of [AEIC], and except as otherwise specifically provided herein, shall be subject in all respects to all terms and conditions of [AEIC's] policy." [8] These two Certificates further state that "[a]ll claims involving this reinsurance, when settled by [AEIC], shall be binding on the Reinsurer, which shall be bound to pay its proportion of such settlements promptly following receipt of proof of loss." These contractual clauses are commonly referred to as "follow form" clauses.

On August 29, 1994, AEIC filed a declaratory judgment action in New Jersey Superior Court against Elf. AEIC did so in response to Elf's demand for indemnification of property damage and bodily injury claims arising out of pollution at Elf's Bryan, Texas site. AEIC later amended its complaint to include additional insurers, parties and issues, and Elf cross-claimed against all named defendants and included claims for coverage of environmental damage and bodily injury at 82 sites throughout the United States.

Elf made a settlement demand of $95 million to AEIC on April 15, 1998, having estimated that AEIC's actual liability under the policies was at least $115 million.[9] Elf believed that, of the 82 sites at issue in the declaratory judgment suit, AEIC's policies were implicated at 37 sites.[10] As a result of Elf's attempt to settle with AEIC, AEIC prepared a presentation to its reinsurers to report to them the status of the settlement negotiations.[11] In that presentation, given on June 11, 1998, AEIC stated that "[a]lthough there is no definitive 'annualization' language contained in any of these three multi-year policies ... certain factors may support an argument that the limits should be annualized." [12] AEIC went on to say, however, that "[AEIC] will

5. *See* Appel Aff. I Ex. 13, Item 4. A facultative reinsurance policy limit of "50% of $2 million each occurrence, in excess of underlying limits of primary insurance" means that Pennsalt or Elf has primary insurance that is responsible, in this case, for the first $25,000. AEIC is liable to the primary insured for the rest, up to $2 million. Swiss Re, in turn, must indemnify AEIC for 50% of whatever AEIC's liability is, up to $1 million (50% of AEIC's maximum liability of $2 million). Any amount of liability retained by an insured is referred to as the "retention."

6. *See* Appel Aff. I Ex. 14, Item 4.

7. *See* Appel Aff. I Ex. 15, Item 4.

8. Appel Aff. I Ex. 14 at 2; Appel Aff. Ex. 15 at 2. There is a dispute as to whether this provision was also a condition to Certificate 100216. Because the outcome of that dispute does not change the result reached herein, the court declines to resolve it.

9. *See* Exhibits 18–50 Accompanying Pl.'s Partial Mot. for Summ. J., Aff. of Richard M. Appel in Supp. of American Employers' Insurance Company's Mot. for Partial Summ. J. ("Appel Aff. II") Ex. 39 at CGU–PW020856, CGU–PW020858–66.

10. *See* Appel Aff. II Ex. 39 at CGU–PW020858–66.

11. *See* Appel Aff. II Ex. 26.

12. *See* Appel Aff. II Ex. 26 at CGU–PW018981. The concern was that Elf would

argue that there is one set of per-occurrence limits on these policies" and that Elf, in its $95 million settlement proposal, "has not annualized the [AEIC] policy limits." [13] On March 31, 1999, AEIC and Elf attended a case management conference in the New Jersey declaratory judgment action. Apparently stemming from comments made by the presiding judge, Judge Weiss, at that conference, AEIC counsel believed "that the court would annualize the [policy] limits." [14]

On April 23, 1999, Elf and AEIC attended an initial mediation session, presided over by retired Judge Richard Cohen.[15] Based on that mediation session, Elf tendered a second demand of $120 million on AEIC.[16] Elf apparently did not suggest that the policy limits be annualized across the policy period.[17] After a further mediation session, Elf made clear that its settlement offer of $120 million was not based on annualized policy limits.[18] The third and final mediation session, conducted on December 16, 1999, also contained no mention of annualization.[19] Despite Elf's apparent rejection of any annualization approach during settlement negotiations with AEIC, AEIC's counsel continued to con-

argue that the established coverage limit per occurrence for the multi-year policy (for example, $2 million dollars) applied once in each year of the policy period, rather than just once across the entire, multi-year period. In other words, AEIC was concerned that for a three-year policy with a limit of $2 million, Elf would attempt to annualize the limit such that the actual coverage was $6 million over three years rather than $2 million over the three-year period. While AEIC addressed the possibility that Elf would attempt to annualize the per-occurrence *limit*, it is unclear whether AEIC addressed the possibility that Elf would attempt to establish that environmental pollution of a site occurring across all three years was actually three separate occurrences, one in each year. In its discussion of the number of occurrences, AEIC did address the possibility that Elf might argue multiple occurrences per site, but used as its example "Bryan Air and Groundwater." *See* Appel Aff. II Ex. 26 at CGU–PW018992. AEIC might thus have been referring to the pollution of two distinct portions of the same site (i.e., air and groundwater), rather than attempting to annualize the occurrence of pollution of one portion over each year of the policy period. Regardless, AEIC claimed that, on the issue of the number of occurrences, it would argue that the contract language indicates one occurrence per site, and that Judge Weiss would likely agree. *See id.*

13. Appel Aff. II Ex. 26 at CGU–PW018981.

14. Appel Aff. I Ex. 3 ("Price Tr.") at 165. Judge Weiss apparently indicated that while the law of the state in which the site was located would govern generally, allocation is-

sues at all sites would fall under New Jersey law. *See* Appel Aff. II Ex. 26 at CGUPW019005. AEIC's counsel believed that allocation issues included annualization issues as "it's virtually impossible to de-link the two in terms of they're so intertwined . . . ." Appel Aff. I Ex. 6 ("Parabue Tr.") at 84. On the issue of annualization, several New Jersey cases hold that where a per-occurrence policy has a multi-year period, and where there is a progressive injury that spans more than one year, the injury is a separate occurrence within each of those years. *See, e.g., Carter–Wallace, Inc. v. Admiral Ins. Co.,* 154 N.J. 312, 712 A.2d 1116, 1121 (1998) (citing *Owens–Illinois, Inc. v. United Ins. Co.,* 138 N.J. 437, 650 A.2d 974, 995 (1994)).

15. *See* Aff. of Robert A. Kole (Volume I) ("Kole Aff. I") Ex. 24.

16. *See* Kole Aff. I Ex. 24.

17. *See* Kole Aff. I Ex. 24 at CGU–PW021032–41.

18. *See* Kole Aff. I Ex. 6 at 264 (stating, in a presentation to AEIC, that Elf's calculations treated each site, with the exception of Bryan Air and Bryan Groundwater, as a single occurrence and that there was a single per occurrence limit for each multi-year policy). It does appear, however, that had the declaratory judgment action proceeded to litigation, Elf might have pursued annualization. *See, e.g.,* Price Tr. at 138–39.

19. *See* Kole Aff. I Ex 26, 27.

duct its settlement analysis using an annualization approach, believing that, if the declaratory judgment action proceeded, Judge Weiss would also do so.[20] AEIC advised Swiss Re of its annualization position on several occasions.[21]

A final settlement agreement between AEIC and Elf was executed in April 2000. Elf was to receive $44 million dollars in two installments. The settlement agreement did not mention annualization.[22] Of the 82 sites at issue, only the ten sites comprising Elf's largest liability ("Top Ten Sites") were the focus of mediation. Even so, Elf continued to seek coverage for the additional twenty-seven sites it believed were covered by AEIC's policies. Despite the fact that no discovery was permitted on those twenty-seven sites, AEIC's settlement with Elf was based on all thirty-seven sites for which Elf sought coverage.[23]

AEIC billed Swiss Re for a total of $27,867,401 ("Reinsurance Tender"), the amount AEIC believed was Swiss Re's share of the $44 million that AEIC paid to Elf.[24] Of this, $20,532,180 reflected AEIC's calculation of what was due under the Certificates.[25] The remainder was money due under certain reinsurance treaties not at issue here.[26] The Reinsurance Tender covered nine of the Top Ten Sites, and also allocated over $2.8 million to liabilities arising from the other twenty-seven sites

that were the subject of the settlement agreement between Elf and AEIC.[27] AEIC's reinsurance billings were based on the exposure analysis it had developed throughout its negotiations with Elf, and therefore annualized both the Certificates and the underlying A–15 policies. To date, Swiss Re has paid $13,673,449, which is the amount it believes it owes AEIC under the Certificates.

Before this court are AEIC and Swiss Re's cross-motions for Partial Summary Judgment. AEIC seeks a declaration that, as a matter of law, AEIC's Reinsurance Tender was reasonable and consistent with the terms of the Certificates. Swiss Re, on the other hand, contends that the Certificates do not contemplate annualization, and thus argues that, as a matter of law, Swiss Re is not liable for $3,472,696 that resulted from AEIC's annualization approach. Swiss Re further seeks a declaration that it is not responsible for the $1,196,747 AEIC billed it under the Certificates for the twenty-seven sites on which AEIC did no investigation.

## DISCUSSION

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

**20.** *See* Appel Aff. I Ex. 8 at CPS–002914; Appel Aff. I Ex. 9 at CGU–PW002030.

**21.** *See* Appel Aff. II Ex. 41 at 1 (noting in a November 24, 1999 letter to Swiss Re that there is "a substantial likelihood of annualization if the issue is litigated"); Appel Aff. II Ex. 42 at SRA–P–0005 (pointing to New Jersey law, in a letter dated December 22, 1999, to support AEIC's belief that annualization was likely, even though AEIC stated in the same letter that it "would argue in court that a single limit should apply to [the] multi-year policies"); Appel Aff. I Ex. 7 at CGU–PW000755 (noting that at a December 22, 1999 meeting, AEIC represented to Swiss Re

that "annualization was significant to [AEIC's] settlement valuation").

**22.** *See* Kole Aff. I Ex. 13.

**23.** *See* Appel Aff. I Ex. 4 at SRA–P 6049.

**24.** *See* Kole Aff. I Ex. 11.

**25.** *See* Kole Aff. I Ex. 11.

**26.** *See* Kole Aff. I Ex. 11.

**27.** *See* Kole Aff. I Ex. 11 at SRA–P 6100, SRA–P 6119.

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [28] The "party seeking summary judgment [must] make a preliminary showing that no genuine issue of material fact exists. Once the movant has made this showing, the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." [29] The party opposing summary judgment must produce specific evidence of a material factual dispute. That the Parties have filed cross-motions for summary judgment makes no difference to this standard. "The happenstance that all parties seek summary judgment neither alters the yardstick nor empowers the trial court to resolve authentic disputes anent material facts." [30] A court considering cross-motions for summary judgment must consider "each motion separately, being careful to draw inferences against each movant in turn." [31]

## A. Annualization of the Occurrence.

 AEIC looks to the "follow the fortunes" doctrine [32] to argue that Swiss Re is obligated to accept AEIC's reasonable determination of Swiss Re's liability under the Certificates. AEIC argues that since its decision to annualize the occurrence under the multi-year policies was a reasonable one in light of Judge Weiss's indication that he would apply New Jersey law to allocation issues, Swiss Re is bound by it. Swiss Re, for its part, argues that the "follow the fortunes" doctrine simply does not apply to this case. The inquiry, according to Swiss Re, is whether the Cer-

28. Fed.R.Civ.P. 56(c).

29. *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996) (internal citations omitted).

30. *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990) (internal citations omitted).

31. *Id.*

32. Under the "follow the fortunes" doctrine, reinsurers are "to accept a reinsured's good faith decision that a particular loss is covered by the terms of the underlying policy . . . ." *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 9 F.Supp.2d 49, 66 (D.Mass.1998). Under a related doctrine, known as the "follow the settlements" doctrine, "[a] reinsurer is required to cover settlements made by the reinsured, so long as they are not fraudulent, collusive, or made in bad faith." *Id.* At least two of the Certificates expressly incorporate both of these doctrines on the conditions page, which states that Swiss Re's "liability . . . shall follow that of [AEIC], and except as otherwise specifically provided herein, shall be subject in all respects to all terms and conditions of [AEIC's] policy" and also that "[a]ll claims involving this reinsurance, when settled by [AEIC], shall be binding on the Reinsurer, which shall be bound to pay its proportion of such settlements promptly following receipt of proof of loss." Whether the "follow the fortunes" and "follow the settlements" doctrines apply in the absence of express contractual language remains an open question. Although not universally accepted, the favored view is that "follow the fortunes" and "follow the settlements" are an industry custom, and apply even in the absence of express language to that effect. *See Aetna Cas. & Sur. Co. v. Home Ins. Co.*, 882 F.Supp. 1328, 1349 (S.D.N.Y.1995) (noting that "although the authorities admittedly do not speak with one voice," the weight of authority supports the view that, even in the absence of express contractual language, "follow the fortunes" "generally applies irrespective of whether it is expressed in the contract of reinsurance"). The *Aetna* court went on to opine that "it would be difficult to imagine how reinsurance transactions could function" in the absence of "follow the fortunes" and to find that "it is customary within the reinsurance industry for reinsurers to follow the claim settlement decisions of the ceding company even in the absence of an explicit loss settlements clause." *Id.* at 1350. This court adopts that view as well, and uses the phrase "follow the fortunes" to refer to both the "follow the fortunes" and "follow the settlements" doctrines, as well as the use of such language expressly within the reinsurance contract.

tificates, as a matter of contract construction, contemplate the annualization of a single occurrence spanning multiple years such that there is deemed to have been a separate occurrence in each year of the policy period. Stated differently, Swiss Re argues that "follow the fortunes" cannot override the unambiguous language of the Certificates, which clearly does not provide for annualization.

▮▮▮ Swiss Re is correct that follow the fortunes does not allow an insured to circumvent the stated limits of an insurance policy. Numerous courts, including one in this district, have held that "follow the fortunes" is not a tool with which an insured can alter the bargained-for limitation of liability in a reinsurance contract.[33] Follow the fortunes exists to prevent a reinsurer from second-guessing whether a particular *type* of injury or damage was properly within the cedent's policy with the primary insured, and thus whether a cedent properly settled a claim for which it now seeks indemnification from the reinsurer.[34]

In *Commercial Union,* a case recently decided in this district and involving identical parties to the ones before this court now, the cedent submitted a reinsurance tender in which it had "calculated the value of its claims on an annualized basis with each policy providing for a one occurrence limit per year ...."[35] Judge Woodlock held that a follow form clause did not obligate the reinsurer to annualize the limit of liability, because this was outside the scope of the coverage provided by the reinsurance certificates.[36] In other words, Judge Woodlock found that the reinsurer was not challenging the cedent's decision to pay a certain *type* of claim, which would have violated the follow form clause in the certificates. Instead, the reinsurer was

**33.** *See, e.g., Commercial Union Ins. Co. v. Swiss Reinsurance Am. Corp.,* No. CIV.A.00–12267–DPW, 2003 WL 1786863, at *16 (D.Mass. Mar. 31, 2003) (Woodlock, J.) (holding that the " 'follow form' provisions of the Certificates, while assuring concurrence of coverage, may not be used to increase the reinsurer's unambiguous, bargained-for limits of liability as stated in the Certificates" and finding further that the neither the follow the fortunes doctrine nor the follow the settlements doctrine required a different result); *Unigard Sec. Ins. Co. v. N. River Ins. Co.,* 4 F.3d 1049, 1071 (holding that all contractual language, including a follow the fortunes clause, must be construed in light of the contract's stated limitation of liability); *Bellefonte Reinsurance Co. v. Aetna Cas. & Sur. Co.,* 903 F.2d 910, 913 (2d Cir.1990) (finding no support for the assertion "that a 'follow the fortunes' clause can render a reinsurer liable for an amount in excess of the bargained-for coverage" and holding that such a clause coexists with, rather than supplants, the liability cap).

**34.** *See, e.g., Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.,* 979 F.2d 268, 280 (2d Cir.1992) (stating that a reinsurer is not obligated to indemnify the cedent for payments beyond the scope of its agreed-to exposure);

*Swiss Reinsurance Am. Corp.,* 2003 WL 1786863, at *12 (noting that "follow the fortunes" is "intended primarily to forestall, if not prevent, litigation between ceding insurers and reinsurers over the [sic] whether a claim is 'of a type' covered by the primary insurance").

**35.** *Swiss Reinsurance Am. Corp.,* 2003 WL 1786863, at *6.

**36.** *See id.* at *16. The three reinsurance certificates at issue were multi-year policies that had the following stated limits: No. 101085 was limited to "50% quota share of first $1,000,000 each occurrence;" No. 103970 was limited to "$350,000 each occurrence part of the first $500,000;" and No. 0080916 was limited to "$187,500 part of first $500,000, nil of next $4,500,000." In its calculations, the cedent apparently applied the stated per-occurrence limit once for each year of the multi-year policy period. Stated differently, the cedent treated an occurrence of environmental pollution that spanned multiple years as one occurrence, but applied the coverage limit to each of the years covered by the policy, rather than just once over the entire policy period.

challenging the amount it was obligated to indemnify under the express limit of the reinsurer's liability in the reinsurance certificates.

AEIC asks this court to distinguish the case before Judge Woodlock from the instant case, because AEIC argues that in this case it is seeking to annualize the occurrence, rather than the liability limit, and is doing so because it reasonably believed that New Jersey law applied to the allocation of its settlement with Elf. This court is unconvinced that such a distinction exists, particularly in light of AEIC's own statement in its Reinsurance Tender that it "considered that *annualized limits* were available under the [AEIC] policies" and that their exposure analysis "applied *annualized limits.*"[37] Even if AEIC were correct that in the case at bar it seeks to annualize the occurrence, Swiss Re's challenge to AEIC's allocation remains a challenge not to the *type* of claim that AEIC covered, but instead a challenge to how much of that claim Swiss Re is obligated to indemnify. The proper place for this analysis thus remains with the Certificates. This court is faced initially, therefore, with the determination of which law to apply in construing the language of the Certificates.

Because this court has subject matter jurisdiction over this suit due to the Parties' diverse citizenship, Massachusetts choice of law rules apply to this action.[38] Massachusetts rejects a rigid choice of law approach, and instead has adopted a "functional choice of law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole."[39] AEIC is a Massachusetts corporation with its principle place of business in Boston, Massachusetts.[40] Swiss Re is a New York corporation with its principle place of business in Armonk, New York.[41] Neither party alleges that the Certificates were negotiated in New Jersey, nor that New Jersey has any other contact with the Certificates beyond AEIC's choice to pursue its declaratory judgment action against Elf there. The law to apply in construing the Certificates is therefore either New York or Massachusetts law. As the application of either Massachusetts or New York law yields the same result, it is unnecessary to make a formal choice of law decision.[42]

In construing the Certificates, the starting point is the plain and ordinary meaning of the terms of the contract.[43] Unambiguous contracts are enforced according to their terms.[44] The Certificates themselves do not define "occurrence." The underlying policies with Elf, however,

**37.** Kole Aff. I Ex. 11 at SRA–P 6043, SRA–P 6046 (emphasis added). In other words, although AEIC could have said that it believed that the "occurrence" ought be annualized, it instead chose to speak in terms of "annualizing the limits."

**38.** *See A. Johnson & Co. v. Aetna Cas. & Sur. Co.*, 741 F.Supp. 298, 299 (D.Mass.1990).

**39.** *Id.* (quoting *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662 (1985)).

**40.** *See* Compl. ¶¶ 1–2.

**41.** *See* Compl. ¶ 3.

**42.** *See Royal Bus. Group, Inc. v. Realist, Inc.*, 933 F.2d 1056, 1064 (1st Cir.1991); *Commercial Union Ins. Co. v. Swiss Reinsurance Am. Corp.*, No. CIV.A.00–12267–DPW, 2003 WL 1786863, *7 n. 6 (D.Mass. Mar. 31, 2003)

**43.** *See Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co.*, 220 F.3d 1, 4 (1st Cir.2000).

**44.** *See Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 9 F.Supp.2d 49, 65 (D.Mass.1998) (citing *Somerset Sav. Bank v. Chicago Title Ins. Co.*, 420 Mass. 422, 649 N.E.2d 1123, 1127 (1995)).

each of which corresponds to one of the Certificates, define "occurrence" as "an accident, or an event, or continuous or repeated exposure to conditions, which results during the policy period in personal injury, property damage, or advertising liability ... neither expected nor intended from the standpoint of the Insured."[45] Although neither "occurrence" undefined, nor the definition of occurrence provided in the primary policy, is without ambiguity in a vacuum, there can be no doubt but that the Parties did not intend that a single event spanning multiple years would constitute a separate occurrence in each year.[46]

As primary evidence for this, the court looks to AEIC's own representations to Swiss Re concerning the annualization of "occurrence." In its June 11, 1998 presentation to its reinsurers, AEIC stated that the "occurrence" language in its underlying policies indicates "one occurrence (per site)" and also stated its belief that "the 'occurrence' language may act as a limit of liability for the claims at issue at the various sites."[47] AEIC went on to opine that "Judge Weiss will probably find one occurrence per site."[48] The October 1999 settlement analysis prepared by AEIC's attorneys states:

The [AEIC] policies at issue contain language providing that all personal injury and property damage arising out of one event, or continuous or repeated exposure to substantially the same general conditions, existing at or emanating from one premises location shall be deemed to be *one occurrence*. Based on his ruling in [another] matter, we believe that Judge Weiss will accept our argument that there is one occurrence per site.[49]

AEIC's pre-settlement representations to Swiss Re as to the meaning of "occurrence" comport with the language used to define "occurrence" in AEIC's policies with Elf. Those policies define a single "occurrence" as, among other things, a "continuous or repeated exposure to conditions." The definition does not limit an occurrence to "continuous or repeated exposure to conditions within a single year," and the court declines to do so now. Similarly, the Certificates do not say "each occurrence each year," and to add such language would be inappropriate. Ample case law, as well as AEIC's own representations to Swiss Re that, were the issue litigated, AEIC would oppose annualization, provide further support for this decision.[50]

45. Appel Aff. I Ex. 10 at 3; Appel Aff. I Ex. 12 at 4 (using identical language to define "occurrence"); Appel Aff. I Ex. 11 at 3 (defining "occurrence" as "an accident, or an event, or continuous repeated exposure to conditions, which unexpectedly results in personal injury, property damage, or advertising liability ... during the policy period").

46. *See Seven Provinces Ins. Co.,* 9 F.Supp.2d at 65–66 (citing *J.A. Sullivan Corp. v. Commonwealth,* 397 Mass. 789, 494 N.E.2d 374, 378 (1986), for the proposition that in the presence of ambiguity, the courts look to the intent of the parties, informed in part by custom and usage, to supply meaning to the term).

47. Kole Aff. I Ex. 30 at CP–PS3–001578.

48. Kole Aff. I Ex. 30 at CP–PS3–001578.

49. Aff. of Robert A. Kole (Volume II) ("Kole Aff. II") Ex. 46 at CGU–PW002033 (emphasis in original).

50. *See, e.g., Uniroyal, Inc. v. Home Ins. Co.,* 707 F.Supp. 1368, 1383 (E.D.N.Y.1988) (finding that the chemical company's numerous deliveries of Agent Orange to the military "constituted a single continuous occurrence, a 'continuous or repeated exposure to conditions' " and thereby rejecting insurance company's contention that the chemical company was responsible for multiple deductibles); *cf. RLI Ins. Co. v. Simon's Rock Early College,* 54 Mass.App.Ct. 286, 765 N.E.2d 247, 253 (2002) (finding that "occurrence," defined as an "accident, including continuous or repeated ex-

This court thus concludes that, as in the case before Judge Woodlock, the Certificates do not contemplate annualization, either of the limits or the occurrence. "Follow the fortunes," whether expressly in the contracts or not, does not alter this conclusion. AEIC's Motion for Partial Summary Judgment must thus be denied and Swiss Re's Motion for Partial Summary Judgment is granted, insofar as it seeks a declaration that it is not responsible for any amount that results from annualization. The court turns now to whether allocation of the settlement to twenty-seven uninspected sites was unreasonable as a matter of law.

B. *The Allocation to Twenty Seven Uninspected Sites.*

 Swiss Re challenges the $1,196,747 in AEIC's Reinsurance Tender that reflects AEIC's allocation of $2,819,277 of its $44 million settlement with Elf to twenty-seven sites on which AEIC had no information. In its Reinsurance Tender, AEIC admits that it had "no information on these sites and [was] thus unable to assess their alleged damages, as well as the possible impact on the [AEIC] coverage . . . ."[51] AEIC reiterated this in a March 3, 2000 letter to Swiss Re, stating that "with respect to the other sites valued at $2.8 million, again (as stated before), Elf provided no site information on these other sites because they were not the focus of the mediation."[52] Swiss Re argues that AEIC's allocation of a portion of its settle-

ment to twenty-seven sites on which it had no information was, as a matter of law, unreasonable.

The "follow the settlements" doctrine obligates the reinsurer to cover the cedent's settlement only so long as the settlement is not fraudulent, collusive, or made in bad faith.[53] The reinsurer bears the burden of establishing that the cedent somehow violated its duty to its reinsurer to settle a claim in good faith.[54] The reinsurer's burden is a high one, as it must show not mere negligence, but gross negligence or recklessness.[55] Swiss Re has met its burden here. AEIC's failure to obtain *any* documentation on the twenty-seven sites to which it allocated $2.8 million of its settlement with Elf is wholly inconsistent with its obligation to its reinsurer to settle claims in good faith. Swiss Re is, in turn, under no obligation to indemnify AEIC for that portion of its settlement with Elf allocated to those twenty-seven sites, and Swiss Re's Motion for Partial Summary Judgment must be allowed.

## CONCLUSION

For the foregoing reasons, Swiss Re's Motion for Partial Summary Judgment is ALLOWED, and AEIC's Motion for Partial Summary Judgment is DENIED.

AN ORDER WILL ISSUE

posure to substantially the same general harmful conditions" "clearly contemplates the possibility that multiple acts taking place over a space of time may contribute to a single occurrence for purposes of coverage" and concluding that all the school's negligent acts combined to result in the eighteen-minute shooting rampage).

51. Kole Aff. I Ex. 11 at SRA–P 6119.

52. Kole Aff. I Ex. 23 at SRA–P 0955.

53. *See Commercial Union Ins. Co. v. Seven Provinces Ins. Co.,* 9 F.Supp.2d 49, 66 (D.Mass.1998).

54. *See id.; Hartford Accident & Indem. v. Columbia Cas. Co.,* 98 F.Supp.2d 251, 258 (D.Conn.2000).

55. *See Seven Provinces Ins. Co.,* 9 F.Supp.2d at 66; *Hartford Accident & Indem.,* 98 F.Supp.2d at 258.