**AFFILIATED F.M. INSURANCE COMPANY, Plaintiff,**

v.

**EMPLOYERS REINSURANCE CORPORATION,**
Defendant.

No. C.A. 02–419S.

United States District Court,
D. Rhode Island.

May 12, 2005.

Gary S. Lee, Esq., Rajiv N. Raval, Esq., Kathleen E. Schaaf, Esq., New York City, Matthew T. Oliverio, Esq., Providence, RI, for Plaintiff.

Adam C. Robitaille, Esq., R. Kelly Sheridan, Jr., Esq., James A. Musgrave, Esq., Roberts, Carroll, Feldstein & Peirce, Inc., Providence, RI, Gary R. Green man, Esq., Frank M. Nicolette, Esq., Nicolette Godson & Bielat LLP, New York City, for Defendant.

## DECISION AND ORDER

SMITH, District Judge.

### I. *Introduction*

This case is an asbestos-related insurance dispute between an excess insurer and its reinsurer over how much, if any, of the payments made by the excess insurer to its direct insured constitute covered loss under the reinsurance contract. Before this Court are the parties' respective objections to the Report and Recommendation of Magistrate Judge Martin concerning the parties' cross-motions for summary judgment. The Court generally adopts the recommendations of Judge Martin, but writes separately to address the issues raised by the parties in their objections and to clarify the focus of further proceedings.

### II. *Background*

 Affiliated F.M. Insurance Company ("Plaintiff" or "Affiliated"), a Rhode Island corporation, issued a $5,000,000 umbrella excess liability insurance policy (the "Policy") to Elt, Incorporated, and Baltimore Paint & Chemical Co. (collectively,

the "Direct Insured") in 1975. (*See* DeRita Aff. Ex. 1.) [1] The Policy covered the period from December 31, 1975, to December 31, 1976. However, on October 7, 1976, Affiliated increased the Policy's limits to $10,000,000 at the request of the Direct Insured. In connection with this increase in coverage, Affiliated took out a "Facultative Reinsurance Certificate" [2] (the "Reinsurance Certificate") with Employers Reinsurance Corporation ("ERC" or "Defendant"), a Missouri corporation, to cover the newly acquired $5,000,000 in liability. (*See id.* Ex. 2.) The Reinsurance Certificate provided coverage from October 7, 1976, to December 31, 1976, and called for ERC to indemnify Affiliated for "Nil% of $5,000,000 and 100% of 5,000,000 excess of $5,000,000." [3] (*Id.* Ex. 2 at 1.)

A wave of asbestos-related lawsuits began to be filed against the Direct Insured beginning in the late 1970s. By the late 1980s, "the Direct Insured was flooded with claims arising out of the alleged exposure of individuals to [ ] asbestos-containing products." (*Id.* at ¶ 10.) "The Direct Insured was eventually named as defen-

---

1. Mr. Bill DeRita is a Senior Claims Examiner working as part of the "FM Global" group of companies, which includes Plaintiff. (DeRita Aff. at 1.)

2. "The two basic types of reinsurance policies are 'facultative' and 'treaty.' Facultative reinsurance policies reinsure all or part of a single insurance policy. Treaty reinsurance policies, on the other hand, cover a specified class of policies (for example, property damage policies or earthquake insurance) underwritten by the ceding insurer or insurers." *Am. Employers' Ins. Co. v. Swiss Reins. Am. Corp.*, 275 F.Supp.2d 29, 31 n. 4 (D.Mass. 2003). "Facultative reinsurance entails the ceding of a particular risk or policy. Unlike a treaty reinsurer who must accept all covered business, the facultative reinsurer assesses the unique characteristics of each policy to determine whether to reinsure the risk, and at what price. Thus, a facultative reinsurer 're-

tains the faculty, or option, to accept or reject any risk.' " *N. River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1199 (3d Cir.1995) (quoting William G. Clark, *Facultative Reinsurance: Reinsuring Individual Policies, in Reinsurance,* 117, 121 (R.W. Strain ed., 1980)).

3. The layers of insurance in this case are as follows: (1) the Direct Insured has policies with its direct insurers constituting the Direct Insured's first layer of insurance coverage—these policies are referred to herein as the "underlying policies"; (2) the Direct Insured has umbrella excess liability insurance policies with various insurers (including the Policy with Affiliated) to provide a second layer of protection for situations where the underlying policies are exhausted; and, (3) Affiliated reinsured a portion of its risk on the Policy, with what in effect is a third layer of insurance, by entering into the Reinsurance Certificate with ERC.

dant in tens of thousands of lawsuits in jurisdictions throughout the United States." (*Id.* at ¶ 10.) By letter dated September 10, 1998, the Direct Insured informed its excess liability insurance carriers (including Affiliated) that its primary insurance coverage had been exhausted by these asbestos suits, and demanded that the excess liability insurance carriers agree to indemnify and defend the Direct Insured for and against pending and future claims. (*See id.* Ex. 4.) Affiliated thereupon entered into an "Interim Indemnity and Defense Cost Sharing Agreement" (the "Interim Agreement") with the other excess liability insurance carriers (*see id.* Ex. 6), in which the carriers agreed to share costs on a "continuous trigger" and "time on the risk" basis.[4] Pursuant to the Interim Agreement, Affiliated paid out $2,210,028.40 in indemnity, as well as $865,582.74 in defense costs, over a period of approximately four years. (*See id.* ¶ 26.) In July of 1999, a consultant advised that Affiliated's Policy limit of $10,000,000 would be exhausted by the year 2012. (*See id.* Ex. 8.) This projection was revised in March of 2001, to show exhaustion of Affiliated's Policy limits by 2004. (*See id.* Ex. 9.) Subsequently, on July 3, 2001, Affiliated entered into a "Settlement Agreement and Release" (*see id.* Ex. 11) with the Direct Insured, whereby the Direct Insured agreed to release Affiliated from all future liability in exchange for a payment of $6,000,000 (the "Settlement Amount").

Having paid out a total of $9,179,611.14 under the Policy,[5] Affiliated turned to ERC for reimbursement under the Rein-surance Certificate. Subtracting the $5,000,000 retention, Affiliated submitted a bill to ERC in the amount of $4,179,611.14. (*See* DeRita aff. Ex. 17 (noting total payable by ERC to be $3,314,028.40 and stating that "we will be allocating an additional $[865,582.74] in loss to this claim in the near future representing prior reimbursement of the insured's defense costs").) ERC, however, in a letter dated July 18, 2002, denied payment on the ground that, among other things, "Affiliated FM has allocated $4,179,611.14, the entire amount of [its] payments excess of $5,000,000, to the ERC Certificate, although ERC only reinsured Affiliated FM for a period of less than 3 months (85 days), whereas the Affiliated FM policy was in effect for the entire year." (*Id.* Ex. 20.) ERC also reserved its "right to assert any other applicable defenses to this claim." (*Id.*) Affiliated responded to this denial of payment by filing suit on September 24, 2002. After a period of discovery, Affiliated filed a Motion for Partial Summary Judgment. ERC filed its own Motion for Summary Judgment. (Upset at some of the statements made by ERC, Affiliated also filed a Motion to Strike ERC's Local Rule 12.1 Statement of Material Undisputed Facts.) The motions were referred to Magistrate Judge Martin, who held a hearing on October 17, 2003.

In his Report and Recommendation ("R & R") of September 3, 2004, Judge Martin first recommended that Plaintiff's Motion for Partial Summary Judgment as to defense costs incurred in the amount of $865,582.74 be denied because "it is patent that these costs do not constitute 'loss'

---

4. The phrases "continuous trigger" and "time on the risk" will be explained and discussed in more detail below.

5. As already noted, Affiliated paid $2,210,028.40 in pre-settlement indemnity payments for asbestos claims, as well as $865,582.74 in defense costs. Affiliated also paid $104,000 in non-asbestos claim indemnity. (*See* Pl.'s Rule 12.1 Statement of Undisputed Facts ¶ 34.) Add to this the Settlement Amount ($6,000,000) and one arrives at the total of $9,179,611.14.

under the Certificate." *Affiliated FM Ins. Co. v. Employers Reins. Corp.*, No. CA 02–419S, slip op. at 18 (D.R.I. Sept. 3, 2004) (Report and Recommendation of M.J. Martin) (hereinafter "*Affiliated FM R & R* "); (*see* DeRita Aff. Ex. 2 at 2 (setting forth Reinsurance Certificate, which states that ERC "hereby agrees to indemnify [Affiliated] against loss")). "The Certificate's definition of 'loss' specifically excludes 'claim expenses,' and 'claim[ ] expenses' are defined as 'court costs, interest upon judgment and allocated investigation, adjustment, *and legal expenses.*' " *Affiliated FM R & R*, No. CA 02–419S, slip op. at 18 (emphasis in R & R). "Thus, under the terms of the Certificate, the $865,582.74 in defense costs cannot be counted either as part of the reinsured's $5,000,000 retention or the excess of $5,000,000 'loss'.... Accordingly, Defendant is not required to indemnify Plaintiff for these costs as 'loss' under the Reinsurance Certificate." *Id.*[6]

Next, Judge Martin recommended that Plaintiff's Motion for Partial Summary Judgment as to its claim for $3,314,028.40 (excess of the $5,000,000 retention) be denied because there remain questions of fact precluding summary judgment, both as to Affiliated's satisfaction of the $5,000,000 loss retention and the proper allocation of its loss under the Reinsurance Certificate. Judge Martin noted that Affiliated cannot meet its $5,000,000 retention without the Settlement Amount, but that there is evidence that the Settlement Amount included defense costs not covered by the Reinsurance Certificate. *Id.* at 21. Nor did the doctrines of "follow the fortunes" and "follow the settlements"[7] provide Plaintiff any relief on this point, *see N. River Ins. Co. v. Ace Am. Reins. Co.*, 361 F.3d 134, 139 (2d Cir.2004) ("the doctrine of follow-the-settlements ... requires a reinsurer to indemnify a cedent for a settlement as long as that settlement is reasonable and made in good faith"), because reinsurers "cannot be held accountable for any loss not covered by the reinsurance policy," *id.* at 141. In addition, Judge Martin concluded that "Plaintiff also has not adequately explained the basis for its decision to allocate the entire ... loss to the [Reinsurance] Certificate's 85 day policy period and none to the additional 280 days encompassed by the Umbrella Policy period." *Affiliated FM R & R*, No. CA 02–419S, slip op. at 29.

Judge Martin did recommend granting Plaintiff's Motion to Strike a portion of ERC's Statement of Material Undisputed Facts ("SMUF"), concluding "that paragraphs 20, 22, 23, 25, and 26 of Defendant's SMUF should be stricken as argumentative and improper." *Id.* at 32; *see also id.* ("It is also plain from the wording of [Local Rule 12.1(a)(1)] that the [SMUF] is to be a statement of facts and not argument in support of the motion.").

As to ERC's motion, Judge Martin first recommended that it be granted to the extent it "seeks a declaration that the [Reinsurance] Certificate requires Plaintiff to distinguish between loss and defense payments in applying the $5 million loss retention and in calculating any obligation of Defendant to reimburse for defense costs pursuant to the pro rata expense clause."[8]

---

**6.** Under the Reinsurance Certificate, ERC may be liable for defense costs on a prorated basis (as opposed to covered loss, for which ERC is liable in full up to its liability limit and beyond Affiliated's retention). *See infra* note 8.

**7.** For purposes of this opinion, the terms "follow the settlements" and "follow the fortunes" are essentially synonymous, and will be used interchangeably.

**8.** While the Reinsurance Certificate explicitly excludes claim expenses from the definition of loss, it contains a separate section providing

*Id.* at 35. Judge Martin left open, however, what formula should be used to make that calculation. ERC had proposed two possible ways of calculating the proportion of Affiliated's costs that could be attributed to claim expenses. First, relying on a letter from Plaintiff wherein it was stated that "our settlement . . . will include defense costs, we have estimated future defense cost at approximately $3 million," (DeRita Aff. Ex. 16), ERC argued Affiliated was only entitled to apply $3,000,000 of the Settlement Amount to the calculation of covered loss under the Reinsurance Certificate. But Judge Martin concluded that the statement regarding the $3,000,000 in defense costs was "ambiguous" because "[i]t is not clear if one half of the Settlement Amount is for defense costs or if $3 million is the estimated amount of defense costs which Plaintiff will incur in the future if the Policy is not bought out." *Affiliated FM R & R,* No. CA 02–419S, slip op. at 36. Second, ERC pointed to a statement by Affiliated that, "defense costs are currently 40% of paid indemnity," (Def.'s SMUF Ex. 11), to argue that only 71.5% of the Settlement Amount should be allocated to covered loss, *see Affiliated FM R & R,* No. CA 02–419S, slip op. at 37 ("further defense payments would be 40% of further indemnity payments (which equates to further defense being 28.5% of the total of further defense and indemnity payments)") (quoting Def.'s Mem. S.J.). As to this argument, Judge Martin concluded that "the court is not convinced that the valuations which Defendant assigns to the Settlement Amount for indemnity payments and defense costs have been established as a matter of undisputed facts," and thus "how much of the Settlement Amount should be attributed to defense cost is a disputed issue of material fact."

*Id.* at 38. Therefore, he recommended that ERC's motion should be denied to the extent it moved the Court to accept either of ERC's calculations. Judge Martin did recommend, however, that ERC's motion be granted to the extent it requested ERC be allowed to conduct further discovery on the amounts of Affiliated's defense and indemnity expenses.

In addition to arguing for an allocation between defense costs and loss, ERC argued that Affiliated should have prorated the losses it assigned to the Reinsurance Certificate so as to account for the fact that the Reinsurance Certificate was only on the risk for 85 of the 365 days the Policy was on the risk. Given that 23% (85 days = 23% of 365 days) of all the payments made by Affiliated under the Policy would fail to reach the $5,000,000 Reinsurance Certificate retention, ERC argued that it followed that Plaintiff's Complaint should be dismissed. Judge Martin disagreed, noting that "[w]hile Defendant's argument for proration has a certain surface appeal, it is flawed. Plaintiff only provided $10 million in coverage to the Direct Insured for the same 85 days covered by Defendant's Certificate." *Id.* at 40. "Defendant's argument for proration would make perfect sense," continued Judge Martin, "if Plaintiff had provided the Direct Insured with $10 million in coverage for 365 days, but only obtained reinsurance from Defendant for 85 of those days." *Id.* Nonetheless, "Plaintiff's decision to allocate its entire $9.1 million loss to the 85 days during which the Certificate was in effect and none to the other 280 days of the Umbrella Policy period appears to be inconsistent with [the requirement that allocations be made in good

that ERC will indemnify Affiliated for "that proportion of claim expenses paid by [Affiliated] that the amount of the loss ultimately borne by [ERC] bears to the total amount of the loss." (DeRita Aff. Ex. 2 at 2.)

faith]." *Id.* at 40–41 (citing *N. River Ins. Co.*, 361 F.3d at 141 ("Cedants must make good-faith allocations . . . .")); *see also id.* at 41 ("A good faith allocation should reflect both time on the risk and the degree of risk assumed.") (citing cases). Thus, Judge Martin recommended that summary judgment in favor of ERC on the ground of improper allocation be denied, while noting that the proper allocation formula remained in dispute.

Both parties filed objections to the R & R with this Court. (*See* Pl.'s Consol. Mem.; Def.'s Consol. Mem.) Following a hearing and *de novo* review, *see Rhode Island Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 99 F.Supp.2d 174, 176 (D.R.I.2000), this Court will now set forth its rulings on the various objections.

### III. *Standard of Review*

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When a motion for summary judgment is directed against a party that bears the burden of proof, the movant bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If that showing is made, the nonmovant then bears the burden of producing definite, competent evidence to rebut the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, the nonmovant is required

to establish that there is sufficient evidence to enable a jury to find in its favor. *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.1997).

### IV. *Preliminary Matters*

#### A. *Affiliated's Motion to Strike ERC's Statement of Material Undisputed Facts*

The Court is in complete agreement with Judge Martin's recommendation as to this issue, sees no need to expound further upon it, and adopts the recommendations of the R & R as to this issue.

#### B. *Exclusion of $865,582.74 in Defense Cost*

Affiliated no longer contests that the $865,582.74 in defense cost is outside the Reinsurance Certificate's definition of covered loss. (Pl.'s Consol. Mem. at 3.) Accordingly, this Court adopts the recommendation of Judge Martin on this issue, provided that, to the extent Plaintiff has a viable claim for reimbursement from ERC, it shall be entitled to the prorated portion of defense costs it is entitled to under the Reinsurance Certificate.[9]

#### C. *The $104,000 Non–Asbestos Claims*

Judge Martin did not address the proper characterization of Affiliated's $104,000 indemnity payment on a non-asbestos product liability claim. *Affiliated FM R & R*, No. CA 02–419S, slip op. at 20 ("assuming that the $104,000 payment should be included with the Asbestos Claims"). The nature of this claim is not otherwise clear from the record. There is no suggestion that this claim, as opposed to the asbestos claims, operates on a continuous trigger. Thus, given that this Court concludes below that Affiliated is

---

9. *See supra* note 8.

not entitled simply to aggregate all claims it accumulated during its 12–month period on the risk, the most obvious question is: When did this claim arise? This is a question of fact best left for trial.

## V. Allocation of Loss and Defense Costs

Affiliated objects to Judge Martin's recommendation that the remaining $8,314,028.40 in claims needs to be allocated by the factfinder between loss and defense costs. Affiliated makes two arguments. First, it disputes Judge Martin's conclusion that covered "loss" is defined differently under the Policy and the Reinsurance Certificate. In other words, Affiliated argues there is concurrence between the respective definitions, and thus no basis for allocating Affiliated's reimbursement request into covered and non-covered loss. Second, Affiliated argues that ERC is bound to accept Affiliated's good faith settlement with the Direct Insured under the doctrines of "follow the fortunes" and "follow the settlements." According to Affiliated, these doctrines (discussed in detail below) essentially prevent reinsurers from second-guessing claim handling decisions and nitpicking their way out of their obligations. Affiliated's arguments are a game effort, but they fall short of the mark.

### A. Lack of Concurrence

Affiliated argues that Judge Martin erred because he based his conclusion on a finding of lack of concurrence between the Policy and the Reinsurance Certificate as to what constitutes covered loss. *See Affiliated FM R & R*, No. CA 02–419S, slip op. at 19.[10] Plaintiff argues there is in fact

concurrence between the relevant definitions of loss when one looks to Paragraph V of the Policy. (Pl.'s Consol. Mem. at 11.)

Paragraph V of the Policy states, among other things, that:

> In the event of the reduction or exhaustion of the aggregate limit(s) of liability of the underlying Policy(ies) ... by reason of losses paid thereunder during the term of this Policy, this Policy (1) in the event of reduction, shall pay the excess of the reduced underlying limit; or (2) in the event of exhaustion, shall continue in force as underlying insurance.

(DeRita Aff. Ex. 1 at 4.) This provision basically provides the definition of excess liability insurance: when an underlying policy (i.e., a policy between the Direct Insured and its direct insurer, for which Affiliated provided excess coverage) is exhausted, Affiliated's excess coverage kicks in. It does not, at least on its face, call for any change to the terms of the Policy upon the excess coverage being activated. In fact, Paragraph V is entitled "Limit of Liability—Retained Limit," and it ties directly back to Paragraph I of the Policy, which states that Affiliated generally "agrees to pay on behalf of the insured for ultimate net loss in excess of the retained limit hereinafter stated." (*Id.*) Affiliated, however, argues that the language of Paragraph V, which states the Policy "shall continue in force as underlying insurance" means that Affiliated steps into the shoes of the underlying insurer and assumes the obligations in those policies. Since the relevant underlying policies here do not permit inclusion of expenses in de-

---

**10.** Plaintiff's problem is that under the [ ] Policy defense costs are part of "ultimate net loss" and may constitute part of the $10 million for which Plaintiff is liable under the Policy. In contrast, under the Reinsurance Certificate, such defense costs may not constitute part of either the $5 million retention by

Plaintiff or the $5 million "loss" in excess of $5 million for which Defendant is liable. Thus, as to what constitutes "loss," there is a lack of concurrence between the Umbrella Policy and the Reinsurance Certificate.

*Affiliated FM R & R*, No. CA 02–419S, slip op. at 19 (internal citations omitted).

termining liability limits, Affiliated is obligated to do likewise; and thus under both the Policy and the Reinsurance Certificate "expenses are not loss and are payable in excess of the express limits of liability" (Pl.'s Consol. Mem. at 12). There is therefore no lack of concurrence.

The only evidence Affiliated cites in support of this contention is an intra-company correspondence wherein DeRita states that "[d]efense costs under the applicable Affiliated FM policy are paid outside of limits." (Pl.'s Consol. Mem. Ex. 4.) [11] The argument seems to stretch the limits of logic because it suggests that Affiliated contractually obligated itself to adhere to the various terms of each of the underlying policies it covered. But even giving Affiliated the benefit of the doubt on this point, the real issue surrounding the lack of concurrence would remain. That is, there is significant evidence supporting the conclusion that Affiliated relied on defense costs in meeting its retention and filing its claim under the Reinsurance Certificate,[12] while the Reinsurance Certificate does not recognize defense costs as covered loss. The fact that Affiliated may have done this in contravention of some interpretation of its own Policy has little ultimate impact on the issue before this Court. *See N. River Ins. Co. v. Ace Am. Reins. Co.*, 361 F.3d at

141 ("[R]einsurers ... cannot be held accountable for any loss not covered by the *reinsurance* policy.") (emphasis added). In other words, even if this Court agrees with Affiliated that it (contrary to the express terms of its Policy) is liable for defense costs outside limits—and thus there is concurrence between the Policy and the Reinsurance Certificate—there is still this basic problem: the bill Affiliated submitted to ERC apparently included payments made to cover defense costs in contravention of the Reinsurance Certificate. Affiliated does not argue that it has not, in fact, included defense cost exposure in its calculations of both retention and indemnity under the Reinsurance Certificate. Rather, while it holds up Paragraph V of the Policy in one hand to prevent ERC from looking behind the settlement on the basis of what the Policy and the Reinsurance Certificate say on their face, it holds up the doctrine of follow-the-settlements in the other to prevent ERC from looking behind the settlement on the basis of what Affiliated actually did. It is to this latter argument that the Court now turns.

## B. *Follow the Settlements/Follow the Fortunes*

Affiliated next argues that Judge Martin erred by ordering an allocation of loss and

11. The relevant portion of the correspondence reads:

> [P]aid indemnity to date as to asbestos bodily injury claims is now at $2,210,029 and paid defense costs are at $864,265 for a total of $3,074,294. The remaining indemnity limits under the policy are currently at $7,685,972 ($104,000 was previously paid for an unrelated products claim). Defense costs under the applicable Affiliated FM policy are paid outside of limits.

(Def.'s Consol. Mem. Ex. 4.)

12. The evidence includes the following: (1) the settlement agreement itself, which provides that the Direct Insured "will use the Settlement Amount for defense and indemnity payments" (DeRita Aff. Ex. 11); (2) a letter

wherein DeRita states that "our tentative settlement will be in the area of an additional $6 million ... this figure will include defense costs" (DeRita Aff. Ex. 16); (3) a Reinsurance Proof of Loss sent to ERC by Affiliated on August 16, 2001, which states that "defense costs are included within the limits of our policy per the settlement agreement," (DeRita Aff. Ex. 19); and (4) an Affiliated intra-company correspondence dated July 5, 2001, wherein DeRita states that "since our settlement with the insured includes defense costs within limits we will have to add all the defense costs paid to date to our paid indemnity figure and then cede those amounts to the appropriate reinsurance covers" (Def.'s SMUF Ex. 16).

defense costs because to do so would entail looking behind the settlement, which is prohibited by the doctrines of follow-the-settlements and follow-the-fortunes.[13] Affiliated makes three assertions. First, it argues that ERC is bound by the follow-the-settlements doctrine to accept Affiliated's settlement decisions in the absence of clear evidence of bad faith. Second, even if ERC can demand an allocation of the Settlement Amount between actual defense costs incurred and covered loss, that is not what they are seeking. Rather, ERC is asking for an allocation based upon an assessment of risk of loss (and future exposure to defense cost expenditures) and such determinations are not a proper subject for second-guessing. Third, Affiliated argues that to allow ERC to go behind the settlement would undermine the important policies that underlie the doctrines. The Court will address these arguments in turn.

### 1. Is ERC Required to "Follow the Settlement" Absent a Showing of Bad Faith?

■ As to Affiliated's argument that ERC is bound to accept the settlement under the follow-the-settlements doctrine absent a showing of bad faith,[14] it is first important to note that the Reinsurance Certificate does not include an express follow-the-settlements clause. Affiliated argues that such a clause is implied, citing *Am. Employers' Ins. Co. v. Swiss Reins. Am. Corp.*, 275 F.Supp.2d 29 (D.Mass. 2003). In *Am. Employers Ins.*, the District Court of Massachusetts stated that:

> Whether the "follow the fortunes" and "follow the settlements" doctrines apply in the absence of express contractual language remains an open question. Although not universally accepted, the favored view is that "follow the fortunes" and "follow the settlements" are an industry custom, and apply even in the absence of express language to that effect.

*Id.* at 35 n. 32. The only case cited by the court in support of this conclusion was *Aetna Cas. & Sur. Co. v. Home Ins. Co.*, 882 F.Supp. 1328 (S.D.N.Y.1995). *Aetna* was also cited by another court, *N. River Ins. Co. v. Employers Reins. Corp.*, 197 F.Supp.2d 972 (S.D.Ohio 2002), but in the

**13.** Affiliated also argues ERC may not look behind the settlement because the Reinsurance Certificate explicitly includes settlement amounts in the definition of loss. This is a strained reading of the Reinsurance Certificate. The Reinsurance Certificate provides that "loss" shall mean "only such amounts as are actually paid by [Affiliated] in settlement of claims or in satisfaction of awards or judgments; but the word 'loss' shall not include claim expenses." (DeRita Aff. Ex. 2 at 2.) The provision equates "loss" with, among other things, "settlement of claims." One need only replace the former with the latter in the exclusionary clause to see that expenses are excluded from settlement amounts submitted for reimbursement (i.e., "[settlement of claims] shall not include claim expenses"). Affiliated argues further that to exclude claim expenses from settlement amounts would equate to excluding court costs from judg-

ments submitted for reimbursement. (Hr'g of 11/19/2004, Tr. at 25.) While this may be so, that question is not before the Court and the possibility of such an implication is not so onerous as to dissuade the Court from reading the provision in question as it is plainly written.

**14.** ERC argues this Court should infer bad faith on the part of Affiliated from the fact that: (1) it submitted claims for reimbursement of defense costs as loss when the Reinsurance Certificate explicitly excluded such claims; and (2) it allocated 365 days worth of loss to the 85 days ERC was on the risk so as to improperly maximize its reimbursement from ERC. This Court, however, declines to find that Affiliated acted in bad faith as a matter of law on the record as currently comprised.

course of reaching a very different conclusion.

Plaintiff has cited only three cases where the courts have held that the "follow the settlements" doctrine is inherent in every reinsurance contract, those cases being *Aetna, International Surplus Lines [Ins. Co. v. Certain Underwriters at Lloyd's London,* 868 F.Supp. 917 (S.D.Ohio 1994)], and the district court's opinion in *National American Insurance Co.[ of Cal. v. Certain Underwriters at Lloyd's London,* 93 F.3d 529 (9th Cir.1996)] later reversed by the Ninth Circuit. Most cases which discuss the "follow the settlements" or "follow the fortunes" doctrine were faced with reinsurance certificates which contained express "follow the settlement" clauses. In fact, defendant notes that specific "follow the settlement" clauses are often included in reinsurance certificates, and that the Brokers and Reinsurance Markets Association's *Contract Wording and Reference Manual* promulgated under the direction of William Gilmartin, plaintiff's expert, includes forms for such clauses. It seems logical that if the "follow the settlements" doctrine was so widely accepted as an inherent part of every reinsurance contract that the doctrine may be read into every certificate as a matter of law, there would be no need to include such clauses in reinsurance contracts. *N. River Ins. Co. v. Employers Reins. Corp.,* 197 F.Supp.2d at 986. This Court is hesitant to read terms into a contract given such divergent precedent. But the issue need not be resolved here, because Affiliated's argument fails even if the Court were to assume that a follow-the-settlements clause is implicit in the Reinsurance Certificate.

■■■ "The courts have repeatedly held that the follow the fortunes doctrine does not create reinsurance coverage where none exists under the specific terms of the contract." Edward J. Ozog, et al., *The Unresolved Conflict Between Traditional Principles of Reinsurance and Enforcement of the Terms of the Contractual Undertaking,* 35 Tort & Ins. L.J. 91, 92 (1999). Here, the Reinsurance Certificate explicitly excluded defense costs from the definition of "loss" and Affiliated cannot, and does not, contest this assertion because it agrees it is not entitled to indemnity for the $865,582.74 paid in defense cost preceding settlement (and further acquiesces on this point in contending that there is concurrence between the Policy and the Reinsurance Certificate). What Affiliated is in effect arguing is that under the doctrine of follow-the-settlements it may be reimbursed for payments made to extinguish future liability for defense costs even if it would be precluded from seeking reimbursement for such costs if they were actually incurred, so long as the settlement was entered into in good faith. While there is some appeal to this argument because it encourages settlements by ensuring that decisions will not be nitpicked by reinsurers with the 20/20 vision of hindsight, Affiliated takes it too far. As the court in *N. River Ins. Co. v. CIGNA Reins. Co.,* 52 F.3d 1194, explained, follow-the-fortunes does not give reinsureds carte blanche to impose whatever settlement decisions they make on their reinsurers.

"Follow the fortunes" clauses prevent reinsurers from second guessing good-faith settlements and obtaining de novo review of judgments of the reinsured's liability to its insured. But *while a "follow the fortunes" clause limits a reinsurer's defenses, it does not make a reinsurer liable for risks beyond what was agreed upon in the reinsurance certificate.* In that regard, the reinsurer retains the right to question whether the reinsured's liability stems from an un-

reinsured loss. A loss would be unreinsured if it was not contemplated by the original insurance policy *or* if it was expressly excluded by terms of the certificate of reinsurance.

*Id.,* 52 F.3d at 1199–1200 (emphasis added and internal citations omitted).

Evidence derived from Affiliated's own documents suggests that a significant portion of the settlement was for the payment of defense costs. Such evidence certainly calls into question whether all of the settlement payment was covered loss under the Reinsurance Certificate, which excludes defense costs from its definition of covered loss. *See Am. Ins. Co. v. N. Am. Co. for Prop. and Cas. Ins.,* 697 F.2d 79 (2d Cir. 1982) (holding that insurer could not seek indemnity from reinsurer for settlement amounts paid to cover punitive damages where reinsurance coverage excluded punitive damages). ERC has a right to explore this question further and, if possible, get an answer.

## 2. *Allocation of Risk of Loss*

 Affiliated's argument that ERC may not go behind the settlement to seek an allocation of risk of loss is generally correct. But this is not what ERC is seeking to do. The type of risk of loss assessments that Affiliated is permitted to make in regards to a settlement without risking second-guessing is not at issue here. In *N. River Ins. Co. v. Ace Am. Reins. Co.,* 361 F.3d 134, the Second Circuit held that a reinsurer could not point to a discrepancy between an insurer's pre-settlement risk analysis and its post-settlement claim allocation as justification for looking behind the settlement. *See id.* at 141 ("the court holds that the follow-the-settlements doctrine extends to a cedent's post-settlement allocation decisions, regardless of whether an inquiry would reveal an inconsistency between that allocation and the cedent's pre-settlement assessments of risk"); *see also id.* at 142 ("ACE did not contract to pay 'risk of loss,' nor is it clear that North River could require its upper layer reinsurers to pay a 'risk of loss.' The reinsurance contract is 'essentially a contract of indemnity' which does not arise until the reinsured has paid a claim.") (quoting *Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.,* 979 F.2d 268, 271 (2d Cir.1992)). Affiliated argues that this is what is going on here, because ERC is pointing to Affiliated's pre-settlement analysis of defense costs to argue the post-settlement allocation to covered loss is void. But this characterization is off base. The Second Circuit, in *ACE,* specifically distinguished looking behind the settlement to determine whether the loss claimed is covered by the reinsurance contract (which is permissible) and questioning allocation of covered loss (which is not). *See id.* at 140. In fact, the court points out that "North River's reinsurance billing allocated one percent of the settlement to the value of North River's policy buy-back, which extinguished its liability for non-asbestos related claims that might be brought by Owens–Corning." *Id.* at 143 n. 7. The *ACE* court noted that while North River "distributed this one percent among all its policies based on policy limits and billed its reinsurers accordingly," the fact was that "this payment was not on account of any 'loss,' but rather to extinguish contract liability." *Id.* While the issue was not before the court, the implication is that this allocation of non-covered loss would not be defensible on the basis of a risk-of-loss argument. Here, there is evidence that Affiliated is trying to improperly submit amounts it paid to extinguish its own liability for defense costs as covered loss under the Reinsurance Certificate. ERC's attempt to gain clarity on this point is not akin to chal-

lenging an allowable allocation of risk of loss.

### 3. *Policy Considerations*

 Finally, Affiliated argues ERC should not be allowed to look behind the settlement for policy reasons. It is true that "[t]he follow the fortunes doctrine serves to ensure that the costs of the reinsurance transaction do not become economically prohibitive," by ensuring that "[t]he reinsurer need not duplicate or monitor the adjustment efforts of the reinsured" and that the reinsured will not be denied indemnification "because of errors in an adjustment that was carried out in a sound, businesslike manner." Ozog, et al., *supra*, at 91–92. However, it was not "developed as a means by which one party to a reinsurance contract could deny the other the benefit of its bargain through the imposition of its own will." *Id.* at 92.

 "The rationale for invoking the doctrine and binding the reinsurer applies where not doing so would discourage the cedent from good faith settlement with its insured." *Travelers Cas. & Sur. Co. v. Gerling Global Reins. Corp. of Am.*, 285 F.Supp.2d 200, 211 (D.Conn.2003). Here, the defense to payment asserted by ERC implicates no legitimate incentive on the part of Affiliated to settle with the Direct Insured. Affiliated assessed its own future liability to the Direct Insured under the Interim Agreement and concluded that settlement made economic sense. Specifically, it figured that by settling for the Settlement Amount it would be "saving almost $1.7 million in indemnity [and] its liability for claims expenses in excess of

the Policy limits." (Pl.'s Consol. Mem. at 8.) ERC's challenge here would only implicate Affiliated's incentive to settle on such facts if Affiliated was entering into the settlement on the assumption that it would thereafter seek (improperly) to include in its billings to ERC payments made to extinguish its liability for defense costs, which are explicitly excluded from the definition of covered loss under the Reinsurance Certificate.

In light of all of the above, this Court concludes that an allocation of the Settlement Amount is required as to defense costs versus losses covered by the Reinsurance Certificate. Furthermore, the Court agrees with Judge Martin's conclusion that the proper allocation remains a question of fact. Therefore, ERC is entitled to further discovery on this point, and its request (*see* Def.'s Consol. Mem. at 6) to have the Initial Conference reconvened, so as to address such further discovery, is granted.

### VI. *Proration Based on Time on the Risk*

 Affiliated objects to Judge Martin's recommendation that its claim for reinsurance must take into account ERC's shorter time on the risk. Affiliated bases its objection on the fact that the "Direct Insured took the position that each of its insurance policies was subject to a 'continuous trigger'[15] of coverage for the Asbestos Claims," and the asbestos claims were subsequently allocated among the various insurers under the Interim Agreement on

---

**15.** Arguments can be made that a policy should be triggered by the fact that it was in place at the time: (1) a claimant was exposed to asbestos; (2) a claimant was incubating asbestos; or (3) a claimant manifests symptoms of asbestosis. Under a "continuous trigger" approach, policies in effect at the time of

any of the foregoing are implicated. *See Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1047 (D.C.Cir.1981) ("We conclude, therefore, that inhalation exposure, exposure in residence, and manifestation all trigger coverage under the policies.").

that basis. (Pl.'s Consol. Mem. at 17.) Thus, argues Affiliated,

> based upon a continuous trigger of coverage, each of the 95,000 potential Asbestos Claims against the Direct Insured that triggered coverage on December 31, 1975—day one of the Affiliated FM Policy—would also trigger coverage on each and every day of the 365–day Policy period, including the 85–day ERC Certificate period. The sheer volume and potential value of the Asbestos Claims, pending and projected, would fully exhaust the Policy's $10,000,000 loss limits available during the 85–day period they were in effect.

(*Id.* at 18.) [16]

The problem with this argument is that Affiliated has not put forth any evidence to the effect that it would have been allocated $10,000,000 under the Interim Agreement if it had only been on the risk for 85 days. While there is evidence suggestive of such a conclusion, no calculation or expert testimony was offered to that effect. Rather, the evidence before this Court is that Affiliated was in fact allocated its liability under the Interim Agreement on the basis of its time on the risk. (Pl.'s Consol. Mem. at 26 n. 7 ("The Interim Agreement among the Direct Insured, Affiliated FM and the other excess insurers had a mechanism, based on 'time on the risk', whereby the excess insurers shared their defense and indemnity obligations for the Asbestos Claims.").) Further, Affiliated's decision to settle was based upon its assessment of its risk under the Interim Agreement—in other words, based upon its risk as a function of providing $5,000,000 in coverage for 365 days and another $5,000,000 for 85 days. (Pl.'s Consol. Mem. at 17 ("The Asbestos Claims were administered under the Interim Agreement and were evaluated and settled by Affiliated FM on this basis.").) [17] And finally, Affiliated has been absolutely clear about the fact that the $5,000,000 it paid, which it now seeks to allocate to the 85–day period for purposes of fulfilling the retention requirement, is allocable to it over 365 days. (*See* Pl.'s Consol. Mem. at 29 ("the first $5 million in loss was spread across all 365 days of the Affiliated FM Policy ... as required by the terms of both the Affiliated FM Policy and the ERC Certificate").)

Meanwhile, there is no dispute about the fact that ERC was only on the risk for 85 days. The premium it received—$1,986.32 [18] (DeRita Aff. Ex. 2)—reflects this relatively short time on the risk when compared with the premium Affiliated received—$24,900 (DeRita Aff. Ex. 1)—for taking on the same amount of risk ($5,000,-

---

**16.** Affiliated also argues it is justified in using expenses allocated to it on the basis of its 365 days on the risk to meet its retention requirement under the Reinsurance Certificate because the "the unambiguous language of the ERC Certificate" allows Affiliated to aggregate product hazard (i.e., asbestos-related) losses "on account of all occurrences happening during each consecutive twelve (12) months of the Policy period." (Pl.'s Consol. Mem. at 32.) However, the "12 month" language Affiliated cites, while certainly unambiguous, is not "language of the ERC Certificate." Rather, it is language from Affiliated's own Policy—its contract with the Direct Insured. (DeRita Aff. Ex. 1.) Affiliated has not pointed to anything in the Reinsurance Certificate that grants such aggregation privileges to Affiliated for purposes of meeting the retention requirement.

**17.** The March 12, 2001, letter from consultants regarding expected exhaustion of Affiliated's Policy by 2004 states that "[a]vailable limits were calculated at $5M for the nine month period and an additional $5M for the three month period." (DeRita Aff. Ex. 9.)

**18.** The premium for the reinsurance coverage was $2,563. Subtracting from that a ceding commission paid to Affiliated of $576.68 (22.5%), equals $1,986.32. (*See* DeRita Aff. Ex. 2.)

000) over 365 days. The time-limited nature of the parties' bargain is further reflected in the fact that the Reinsurance Certificate requires that the occurrence for which reimbursement is claimed must take place during the Reinsurance Certificate period, both as to retention and indemnity. Thus, claims incurred by Affiliated that are allocable to periods outside the Reinsurance Certificate's window cannot be used to satisfy the Reinsurance Certificate's retention requirement without twisting the parties' agreement beyond recognition. It is for this reason that Affiliated cannot simply rely on the settlement agreement alone to demand reimbursement from ERC under the Reinsurance Certificate-to do so would make ERC potentially liable for claims outside the window of coverage it agreed to provide.

Nonetheless, Affiliated's continuous trigger argument is not frivolous. It reflects the devastating impact of asbestos liability, where it seems no insurer with any connection to the underlying claims escapes unscathed. Affiliated's argument is that ERC should not be allowed to avoid the responsibilities of its bargain simply because ERC was only on the risk for the 85-day Reinsurance Certificate period, while Affiliated was on the risk for the same 85 days *and* another 280 days. Affiliated contends in effect that the extent of liability of the Direct Insured was so massive that policy limits for *all* policies were met and exceeded—and ERC should be no exception. As stated above, the problem with Affiliated's argument here is its lack of proof. Affiliated points to: (1) the Interim Agreement to show the relevant claims were handled on a continuous trigger; (2) the reports it received from consultants indicating that all policies under the Interim Agreement would eventually be exhausted; and (3) its own settlement with the Direct Insured to show its good faith effort to limit its losses. But in

seeking to add all this up to equal ERC being liable under the Reinsurance Certificate, Affiliated still lacks one missing link in its chain of proof—a link between the $5,000,000 in liability allocated to it on the basis of 365 days on the risk and the $5,000,000 in retention it must satisfy under the Reinsurance Certificate on the basis of only 85-days of coverage.

In light of all of this, the Court concludes that it is only appropriate to allow Affiliated to prove its entitlement to reimbursement under the Reinsurance Certificate by showing that it would still have been allocated its full $10,000,000 in coverage liability under the Interim Agreement even if it had been on the risk for only the same 85-day period as ERC. As set out earlier in this opinion, Affiliated would still have to allocate its retention/reimbursement claim between covered loss and defense costs. Should Affiliated thus satisfy its retention, separate reimbursement for defense costs on a pro rata basis under the Reinsurance Certificate would be available. *See supra* note 8.

If Affiliated is not able to prove its entitlement to reimbursement under the Reinsurance Certificate as just described, the question becomes: What is the proper method of allocation?

### VII. *Method of Allocation*

ERC objects to Judge Martin's recommendation that the proper formula to be used to calculate the correct allocation for purposes of time on the risk remains a question of fact. The Court has already set forth above the suggested calculations of ERC. Judge Martin, in his R & R, suggested a double-weighting method of calculation. *Affiliated FM R & R*, No. CA 02–419S, slip op. at 42 ("Because Plaintiff had twice the risk during the 85 days of the [Reinsurance] Certificate period, those

85 days should be doubly weighted in allocating the payments Plaintiff made to resolve its liability under the [ ] Policy.").

The dilemma for Affiliated is that while ERC and Judge Martin have offered differing formulas to resolve the time-on-the-risk allocation issue, all of these formulas leave Affiliated short of bringing a compensable claim for reinsurance coverage. *See, e.g., Affiliated FM R & R*, No. CA 02–419S, slip op. at 42 ("[D]ouble weighting would result in 37.78% of the 9.1 million (or $3,437,980) in payments being allocated to the 85 days during which Plaintiff provided $10 million in coverage. As $3,437,980 does not exhaust Plaintiff's $5 million retention, Plaintiff would not be entitled to any indemnification from Defendant.").[19] Meanwhile, Affiliated has offered no alternative formula. Rather, it has simply continued to insist allocation on the basis of time on the risk is improper. (The congruent results of the different formulas described may well explain why.) An argument can certainly be made (and ERC has made it) that such bald denial is not sufficient to withstand summary judgment. This Court disagrees, however, and will follow the recommendation of Judge Martin on this issue and decline to find that, as a matter of law, there exists no formula accounting for time on the risk pursuant to which Affiliated could make out a viable claim for reimbursement.

## VIII. *Conclusion*

For the foregoing reasons, the Court hereby ORDERS as follows:

1. Plaintiff's Motion to Strike Defendant's Statement of Material Undisputed Facts is GRANTED to the extent that paragraphs 20, 22, 23, 25, and 26 should be stricken;

2. Plaintiff's request for imposition of attorneys' fees and costs associated with the filing of its Motion to Strike is DENIED;

3. Plaintiff's Motion for Partial Summary Judgment on its breach of contract claim is DENIED;

4. Defendant's Motion for Summary Judgment on the ground of improper allocation is DENIED;

5. Defendant's Motion for Summary Judgment is GRANTED to the extent it seeks to exclude Plaintiff's defense costs of $865,582.74 from forming a basis of Plaintiff's loss retention or loss indemnity entitlement under the Reinsurance Certificate;

6. Defendant's Motion for Partial Summary Judgment is GRANTED to the extent it seeks an Order declaring that: (a) claim expenses are excluded from the definition of "loss" under the Reinsurance Certificate, and (b) Defendant is entitled to pursue discovery on the amounts of Plaintiff's defense and indemnity payments (the Initial Conference will be reconvened for the purposes of coordinating this further discovery); and

7. Defendant's Motion for Summary Judgment is GRANTED to the extent it seeks an Order that Defendant's liability for losses incurred by

---

**19.** Affiliated suggests that such a result would be absurd. (*See* Pl.'s Consol. Mem. at 33.) However, it is worth noting that in the context of a direct insured and its primary insurer, allocations have been approved that leave the direct insured bearing the cost for periods during which no insurer was on the risk. *See Ins. Co. of N. Am. v. Forty–Eight Insulations, Inc.*, 451 F.Supp. 1230, 1243 (E.D.Mich. 1978), *aff'd*, 633 F.2d 1212 (6th Cir.1980) ("Forty–Eight must bear judgment liability for injuries apportioned to the period when it had/has no coverage.").

Plaintiff needs to be prorated to take into account Defendant's time on the risk. Plaintiff may satisfy this time on the risk proration requirement by demonstrating it would have been allocated $10,000,000 in indemnity under the Indemnity Agreement even if it had only been on the risk for the same 85 days as Defendant.

IT IS SO ORDERED.